# Case No. 4,860.

## FLEEGER et al. v. POOL et al.

[1 McLean, 185.] [1]

Circuit Court, W. D. Tennessee. Sept. Term, 1832.[2]

Mr. Washington, for plaintiff.
Mr. Yerger, for defendants.

OPINION OF THE COURT. This action of ejectment is prosecuted to recover possession of two thousand seven hundred and twenty-seven acres of land in Montgomery county, Tennessee, lying south of what is called Walker's line, which is the present boundary line between the states of Kentucky and Tennessee; and north of what is called Matthews' line, which runs in latitude 36 degrees 30 minutes, north, and which by the constitution of North Carolina, is declared to be the northern boundary of the state. The lessors of the plaintiff claim as devisees of Frederick Rohrer, who claims under a grant from the state of Kentucky, dated 24th February, 1796. The defendants claim under certain grants from North Carolina, dated in 1786, 1792, and 1797; also, under grants from the state of Tennessee, dated in 1809, 1811, '12 and '14. And the defendants have proved that possession was taken under their grants about the time of their respective dates, and that the land has ever since been occupied under the same title.

The following articles of compact between the states of Kentucky and Tennessee, have

---

[1] [Reported by Hon. John McLean, Circuit Justice.]

[2] [Affirmed in 11 Pet. (36 U. S.) 185.]

been read, and have a direct bearing in the case:

"Article 1. The line run by the Virginia commissioners in the year 1779, and '80, commonly called Walker's line, as the same is now reputed, understood, and acted upon by the said states, their respective officers and citizens, from the south eastern corner of Kentucky, to the Tennessee river, thence with and up the said river to the point where the line of Alexander and Munsell, run by them in the last year, under the authority of an act of the legislature of Kentucky, entitled "An act to run the boundary line between this state and Tennessee, west of the Tennessee river, approved February 8th, 1819," would cross said river, and thence with the said line of Alexander and Munsell to the termination thereof, on the Mississippi river, below New Madrid, shall be the boundary line between the two states."

"Article 4. The claims to lands lying west of the Tennessee river, and north of Alexander and Munsell's line, derived from North Carolina or Tennessee, shall be considered null and void, and claims to lands lying south of said line, and west of Tennessee river, derived from Virginia or Kentucky, shall, in like manner be considered null and void.

"Article 5. All lands now vacant and unappropriated by any person or persons claiming to hold under the states of North Carolina or Tennessee, east of the Tennessee river, and north of the parallel of latitude of 36 degrees 30 minutes north, shall be the property of, and subject to the disposition of the state of Kentucky, which state may make all laws necessary and proper for disposing of and granting said lands," &c., "and may by herself or officers do any acts necessary and proper for carrying these provisions into effect; and any grant or grants she may make therefor, shall be received in evidence in all courts of law or equity in the state of Tennessee, and be available to the party deriving title under the same," &c.

"Article 6. Claims to lands east of the Tennessee river, between Walker's line and the latitude of thirty-six degrees and thirty minutes north, derived from the state of Virginia in consideration of military services, shall not be prejudiced in any respect by the establishment of Walker's line, but such claims shall be considered as rightfully entered or granted, and the claimants may enter upon said lands, or assert their rights in the courts of justice, without prejudice by lapse of time, or from any statute of limitations for any period prior to the settlement of the boundary between the two states; saving, however, to the holders and occupants of conflicting claims, if any there be, the right of showing such entries or grants to be invalid and of no effect, or that they have paramount and superior titles to the land covered by such Virginia claims.

"Article 7. All private rights and interests of lands between Walker's line from the Cumberland river, near the mouth of Oby's river to the south eastern corner of Kentucky, at the point where the boundary line between Virginia and Kentucky intersected Walker's line on the Cumberland mountain, and the parallel of thirty-six degrees thirty minutes north latitude, heretofore derived from Virginia, North Carolina, Kentucky, or Tennessee, shall be considered as rightfully emanating from either of those states; and the states of Kentucky and Tennessee reserve to themselves respectively the power of carrying into grant claims not yet perfected; and in case of conflicting claims, (if any there be,) the validity of each claim shall be tested by the laws of the state from which it emanated; and the contest shall be decided as if each state respectively had possessed the jurisdiction and soil, and full power and right to authorize the location, survey or grant according to her own rules and regulations."

This treaty was ratified by the legislatures of the two states, the sanction of congress having been previously given. It appears that Walker's line is about eight miles north of Matthews' line, and that the land in controversy lies between them. It is also proved that the states of North Carolina and Tennessee have always claimed up to the line of Walker, after it was run, as the boundary, between those states and the states of Virginia and Kentucky. And that south of Walker's line the state of Tennessee has always exercised jurisdiction, the same as over other parts of the state. And this exercise of jurisdiction would seem to have been acquiesced in by Kentucky, as her jurisdiction was not exercised south of the line. The counties of both states were bounded by it.

The will of Frederick Rohrer is offered in evidence, to which two objections are made: (1) On account of the insufficiency of the certificate and probate to authorize its registration in the state. (2) That said will was registered in Tennessee after the institution of this suit; and therefore can only take effect from the date of registration. This will purports to have been made and published and proved in the state of Pennsylvania. And it is clear, as contended by the counsel for the defendants, that a will or any other instrument to convey lands in Tennessee, must derive its efficacy from the laws of Tennessee. By the act of 1823, c. 31, the legislature of Tennessee authorizes copies of wills made out of the state to be recorded in the county where the land lies, provided they shall have been proved according to the law then in force in the state, as to wills made and executed within the state; and when so recorded shall have the same force and effect as if the original had been executed in this state, and proved and allowed in its courts; and shall be sufficient to pass lands and other estate.

This act does not appear to require that the will or the copy of the will shall be

proved in this state, as a will presented for probate would be required to be proved; but that it shall have been proved in the state where it was made and published, in the mode required by the laws of Tennessee. How could a copy of a will be proved in Tennessee, as an original will presented for probate? The probate of this will as made in Pennsylvania seems to be substantially what the law of Tennessee requires, and this is duly certified. This point, however, may be hereafter considered, should the counsel for the defendants bring it before the court by motion.

As to the objection in regard to the registration, we have no hesitancy in overruling it. The registration does not create the instrument, but makes it admissible in evidence; and it has relation back to the proof of the will. Suppose a law of Tennessee required deeds executed in another state for land in this state to be recorded in the county where the land is situated before they can be received as evidence of title, would the registration not have relation back to the execution of the deed? Is not this the rule, under the statute in regard to deeds executed and registered within the state? The will is admitted to be read to the jury.

Another objection is made that the title offered in evidence by the lessors of the plaintiff, shows a tenancy in common and the declaration sets out a joint demise. This objection is obviated by the practice of the courts in Tennessee, under the act of 1801, c. 6, § 60 [Acts N. C. & Tenn. 1715–1813, p. 342], which provides "that after issue joined in any ejectment on the title only, no exception to form or substance shall be taken to the declaration in any court, whatever." 2 Yerg. 227.

The preliminary questions having been considered, we will come to the main point in the case. Walker's line, which by the compact is made the boundary between Kentucky and Tennessee, is not the boundary described in the original charter of the colony by Charles II. and recognized in the constitution of the state of North Carolina. This was at 36° 30' which is designated by Matthews' line. This then, was the original and true boundary. And this is admitted by the state of Tennessee in the compact, and in the sanctions given by her of that instrument. From these facts it follows that the lands granted to the defendants by the states of North Carolina and Tennessee, and which are involved in this suit, were granted when they were beyond the limits of those states. They had possession and exercised jurisdiction, but this possession and jurisdiction the state of Tennessee has admitted to have been wrongful.

There may be many acts done in the exercise of such a jurisdiction, which of necessity must be considered ever afterwards final and conclusive. But these acts are generally of a temporary character, however much they may affect the rights of individuals, and emanating from the sovereign power de facto, cannot at a subsequent period be reviewed and corrected. But this rule does not apply to a grant made of the soil, which is of itself an act of sovereignty and of a permanent character. A state no more than an individual, can grant that which does not belong to it. If the grants then made beyond the limits of the state conveyed no right, no right was taken or appropriated under the compact. The state making the grant may consider herself bound morally to make some remuneration to grantees for these lands, under the circumstances; but to admit, as the state of Tennessee has admitted in the compact, that the grants were for land beyond her jurisdiction, which must consequently render them inoperative, does in no sense impair the obligation of her contract. The contract though executed, had no legal existence as a title.

But there is another and a higher ground, on which this case may be decided. These states acted in their sovereign capacities in entering into the compact or treaty. The subject was one which peculiarly belonged to the sovereign power; and acting under the sanction of congress, their powers were ample to treat as to their respective limits; and the compact was binding upon the citizens of each. No power can supervise or object to the decision thus made. It is binding as well on the federal as the state courts. The act is one of sovereignty and can only be modified or annulled by the exercise of the same power. And if in the adjustment of boundaries the rights of individuals shall become impaired, they must look to their respective governments for indemnity. It would indeed be a novel principle in the laws of nations, for individuals to object to a treaty of limits and endeavor to annul it, because their interests were not suitably protected. This would be to place private interests above those that are national; and to subject the political power of a state to the counteraction of any one of the elements of which it is composed. The compact is a law to the sovereigns who entered into it, and it is equally a law to their citizens. It regulates the rights and remedies of all who are affected by it.

If these defendants can interpose their rights and render the treaty ineffectual in part, it must become so entirely. Kentucky cannot be called upon to give effect to her engagements, if Tennessee shall disregard hers. By such means then the treaty must fall, and the prosperity, if not the peace of the two sovereignties may be jeoparded. The compact must stand, and effect must be given to its stipulations. We will therefore instruct the jury, that as by the compact between Kentucky and Tennessee, the boundary line of thirty-six degrees thirty minutes north, was fixed several miles south of Walker's line, and of the land in controversy; the

titles of the defendants were subject to the compact, and can only be sustained under it. That the state of Tennessee, by sanctioning the compact, admitted in the most solemn form that the lands in dispute were not within her jurisdiction nor within the jurisdiction of North Carolina, at the time they were granted; and that consequently, the titles were subject to the conditions of the compact.